UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REBECCA GOODUM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 03 C 3257 |
| | ) | |
| THOMAS E. WHITE, Secretary of the | ) | Judge Nan R. Nolan |
| United States Department of the Army, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rebecca Goodum filed suit against Thomas E. White, Secretary of the United States Department of the Army ("the Army"), alleging sex and race discrimination and hostile work environment sexual harassment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*; violation of both the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k); failure to accommodate her disability in violation of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; and retaliation. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is now before the court on the parties' cross-motions for summary judgment. For the reasons set forth below, the Army's motion is granted and Goodum's motion is denied.

## BACKGROUND

Goodum and the Army filed cross-motions for summary judgment on April 4 and 7, 2005, respectively. On April 26, 2005, the court granted Goodum's motion to modify the briefing schedule, setting a response date of May 26, 2005. (Minute Order of 4/26/05, Doc. No. 41.) Goodum submitted a responsive memorandum approximately one week late on June 2, 2005, but she did not respond to the Army's Local Rule 56.1 Statement of Uncontested Facts. As a result, the Army filed a motion to deem those facts admitted. At a hearing before the court on June 15, 2005, Goodum's attorney claimed that he never received the Rule 56.1 Statement of Facts even

though the Army sent it in the same Federal Express package as the supporting memorandum. The court instructed Goodum's attorney to submit a sworn affidavit regarding the document by June 21, 2005. (Minute Order of 6/15/05, Doc. No. 47.)

Rather than submitting a sworn affidavit, Goodum's attorney filed an unsworn Response to Defendant's Motion to Deem Facts Admitted, in which he again maintained that he had never received the Rule 56.1 Statement of Facts and wanted the Army to serve it on him in open court. Even assuming this unlikely assertion is true, the supporting memorandum refers extensively to the Army's statement of facts, yet Goodum's attorney apparently made no effort to obtain a copy of that document. Significantly, to this date, Goodum has still not submitted any response to the Army's statement of facts. As a result, those facts are deemed admitted in their entirety. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."); *Washington v. City of Chicago*, No. 04 C 4502, 2005 WL 2322431, at *1 (N.D. Ill. Sept. 20, 2005) ("By failing to respond to defendants' LR 56.1(a) Statement, Washington has admitted all of the properly supported facts set forth in it.") Nevertheless, the court will also review Goodum's statement of facts in assessing the merits of summary judgment, and will consider all relevant, admissible, non-hearsay statements that are properly supported in the record.[1]

## A. Plaintiff's Employment

Goodum, a Hispanic female, was hired to work for the Army on April 17, 1994 as a Level 9 Budget Analyst with the 416th Engineer Command in Darien, Illinois. (Army Facts ¶ 1; Pl. Facts

---

[1] The court notes that Goodum's statement of facts includes 374 separate paragraphs, many of which are duplicative or not supported by the record. In a proposed amendment to Local Rule 56.1, the judges of this court have observed that "in the *vast majority of cases*, a limit of 80 asserted statements of fact and 40 assertions of additional statements of fact will be *more than sufficient* to determine whether the case is appropriate for summary judgment." (Proposal to Amend the Local Rules, Committee Comments) (emphasis added).

¶ 2.)[2] In July 1999, she was promoted to a Level 11 Budget Analyst and assigned to the 85th Training Support Division in Arlington Heights, Illinois. (*Id.* ¶ 2.) In that position, Goodum was responsible for the Operation Maintenance Army ("OMA") fund and was expected to assist and manage this fund for both the 85th Division and the First Brigade, which did not have a separate budget analyst. (Pl. Facts ¶ 8.) She was also required to maintain membership in the United States Army Reserve, which meant that she worked as a civilian employee during the week and as a soldier during drill weekends.[3] (Army Facts ¶ 3.) Bryan Edwards, a trainee with no prior budgetary experience, worked as the other budget analyst for the 85th Division. Given his lack of experience, Edwards was assigned to the Reserve Personnel Army ("RPA") fund, which entails less detailed objectives than the OMA fund. (*Id.* ¶ 6-8; Army Fact Resp. ¶ 10.)[4]

On October 25, 1999, Charles Petron became the Resource Management Officer for the 85th Division and Goodum's and Edwards' immediate supervisor. (*Id.* ¶¶ 4, 5; Pl. Facts ¶ 35.) Shortly before Petron's arrival, the 85th Division was reorganized to become an "active component headquarters" and one of five training facilities in the country. (*Id.* ¶¶ 9, 10.) As a result of the integration of the active duty component and the Army reserve system, the pace of work at the Division "escalated unbelievably." (*Id.* ¶ 11.)

## B. Goodum's Pregnancy and Telecommute

On November 11, 1999, Goodum learned that she was pregnant. (Pl. Facts ¶ 37.) Approximately two weeks later, Goodum told Petron that her doctor had diagnosed her with a high-

---

[2] Defendant's Local Rule 56.1 Statement of Uncontested Facts is cited as "Army Facts ¶ __." Plaintiff's F.R.C.P. Rule 56 Statement of Undisputed Facts in Support of Motion for Summary Judgment is cited as "Pl. Facts ¶ __."

[3] Goodum is a Major in the Reserves. (Pl. Facts ¶ 24.)

[4] Defendant's Response to Plaintiff's Rule 56 Statement of Facts is cited as "Army Fact Resp. ¶ __."

risk pregnancy and might place her on bedrest.[5] (*Id.* ¶ 38; Army Facts ¶ 12.) Petron was "shocked" by the news given his recent arrival at the Division and the significant increase in workload there, but he told Goodum he would do everything he could to help. (Army Facts ¶ 14; Transcript of Factfinding Conference, Ex. C to Army Facts, at 64-65.)

On December 1, 1999, Goodum sent Petron an email message proposing that in the event she was placed on bedrest, she be allowed to work from home. Goodum explained that this would be her last opportunity to have a child but that she did not want to take a leave of absence because she "cannot afford to go on leave-without-pay" and "because I know the transition of the division has brought about numerous changes and tasks to accomplish." (*Id.* ¶ 15; Email from R. Goodum to C. Petron of 12/1/99, Ex. F to Army Facts; Army Fact Resp. ¶ 40.) At the time, telecommuting was a new concept at the 85th Division, so on December 5, 1999, Petron sent an email message to the Commanding Executive Officer ("CXO") of the 416th Engineer Command, James G. Murphy, to inquire how that facility had handled a similar request. (*Id.* ¶¶ 16, 17; Email from C. Petron to J. Murphy of 12/5/99, Ex. I to Army Facts.) Murphy responded that the Army brought the employee, who was carrying twins and could not drive due to her high-risk pregnancy, 201 files that she could correct, update, and pay from home. (Ex. I.)

On December 9, 1999, Goodum's doctor prepared a note stating that she should work at home after the 14th week of pregnancy. (Ex. 8 to Pl. Facts.) Sometime thereafter, Petron told the 85th Division's CXO, Wayne Marlett, about Goodum's request to telecommute. Marlett met with Goodum, Petron, and the 85th Division's Chief of Staff, Colonel Raymond Canton, to discuss the issue. During the meeting, Petron expressed concern about his ability to monitor Goodum's work and supervise her effectively. (Army facts ¶¶ 19, 20, 40; Pl. Facts ¶¶ 30, 47, 97.) His handwritten notes from the meeting state, in part:

---

[5]  Goodum had a son who died in infancy and two late-term miscarriages. (Army Facts ¶ 13.)

> 1.    You, baby, command
> 2.    Budget formulation & presentation = "Show Stopper"

(Pl. Facts ¶ 48; Ex. 11 to Pl. Facts.) Goodum believes this demonstrates that Petron opposed the decision to allow her to telecommute. (*Id.*) In any event, it is undisputed that Colonel Peter Fee, Comptroller for the 85th Division and Petron's immediate supervisor, also "wanted to make sure that [Goodum's] job was getting done." (Fee Dep., Ex. J to Army Facts, at 19.) On December 15, 1999, Goodum submitted the medical documentation required for her request to telecommute. (Pl. Facts ¶ 47.)

On January 10, 2000, Marlett approved Goodum's request to work from home between January 11 and August 20, 2000 on the condition that she maintain communications with Petron and submit an activity log for every pay period. (Army Facts ¶ 21; Memo re Work at Home, Ex. G to Army Facts.) Marlett imposed these conditions so that Petron could account for Goodum's hours and sign her paycard, and so that Marlett had some documentation to show headquarters that the Division was "in control of what was happening." (*Id.* ¶ 22; Marlett Dep., Ex. H to Army Facts, at 9.) Petron viewed the log as a "management tool," "a method to record eight hours of work for eight hours of pay" and "to protect the command from a future audit down the road." Petron also believed that the log would help prevent "fabrication by other people of time card fraud." (Pl. Facts ¶¶ 88, 89.)

Goodum believes that an activity log is "a great idea" because "there's always going to be people to take advantage of the system." (Army Facts ¶ 23; Goodum Dep., Ex. E to Army Facts, at 91.) She complained, however, that the activity log took her more time than it was worth to complete. (*Id.* ¶ 24; Pl. Facts ¶ 78.) Goodum admits that on occasion she failed to complete her activity log, but Petron merely instructed her to submit it with her timecard and never revoked her telecommuting privileges. She also concedes that she is not aware of any other employee in her

division who was allowed to work at home but was not required to keep an activity log. (*Id.* ¶¶ 25, 26; Goodum Dep., at 96.)

Goodum worked from home between January 20 and June 21, 2000. The Army supplied her with a fax machine, high-speed modem, and other equipment to enable her to perform the job. (*Id.* ¶ 27.) Goodum claims that Petron told Fee the telecommuting situation was increasing his workload. Goodum also claims that, after about the third week of her telecommute, Petron started calling her on the telephone and saying "Oh, how nice - it must be nice that you get to stay home"; "Yeah, well, we have to stay here later, and you don't"; and "Must be nice that as a woman . . . you get to take these kinds of privileges." (Pl. Facts ¶ 52; Goodum Dep., at 103-04.) During a telephone conversation on May 11, 2000, moreover, Petron told Goodum that the problem with her leave "is that you said you were going to come back right after [the baby] was born, and now you're just abusing my -- you know, generosity." (*Id.* ¶ 70; Army Fact Resp. ¶ 70; Goodum Dep., at 105.) Shortly thereafter, on May 30, 2000, Goodum purportedly learned from a co-worker that Petron was spreading rumors that she was abusing her FMLA rights, "thereby creating a negative false impression of Plaintiff in the work environment." (*Id.* ¶ 61.) Goodum's only support for this assertion, however, is her own handwritten note dated January 28, 2000 recording hearsay statements to that effect from other employees. (Ex. 21 to Pl. Facts.)

## C. Complaints About Petron

On April 13, 2000, while Goodum was still working from home, she wrote a letter to Colonel Fee regarding "a situation with [Petron] and the section staff that is escalating and is creating dissention [sic] and confusion not only within the section but also throughout the division." (Army Facts ¶ 42; Letter from R. Goodum to P. Fee of 4/13/00, Ex. K to Army Facts.) In the letter, Goodum complained about Petron's management style, noting his "short tempered, 'easily-frazzled,' and down-talking, rude tendencies." Goodum also stated that Petron "often treats his

staff" in an unprofessional, condescending, or argumentative manner. (*Id.* ¶¶ 43, 44; Ex. K.) In closing, Goodum stated that "[w]e will attempt to meet with [Petron] to address these issues shortly, [but] if this does not work we will ask for your intervention." (*Id.* ¶ 45; Ex. K.)

Fee received complaints from other members of Petron's staff in addition to Goodum. Constance Storer, a management analyst who worked under Petron for approximately one year, testified that Petron was disrespectful and demeaning to his employees and that people viewed him as a poor manager who did not know how to talk to people. (*Id.* ¶¶ 46, 47; Pl. Facts ¶ 99.) Bryan Edwards, the other budget analyst at the 85th Division, stated that Petron scrutinized everything he did and gave him a hard time. (*Id.* ¶ 48.) Cordell Rich, a reservist who worked under Petron's supervision for approximately two years, similarly described Petron as coarse, direct, and insensitive to all of his employees. (*Id.* ¶ 49.) Colonel Lynn Barden testified that Petron is "a loose cannon and can't control his attitude or temper at times." (Pl. Facts ¶ 100; Transcript of Factfinding Conference, at 179-80.) Fee himself describes Petron as intense, not a "people person," abrasive, and demeaning. (*Id.* ¶ 94.)

During a drill training weekend in July 2000, while Petron was away, Fee received a "myriad of complaints" from members of Petron's section about the way Petron conducted himself as a supervisor. (*Id.* ¶ 96.) Specifically, the employees complained that Petron did not listen properly; was demeaning to his subordinates; reacted loudly and boisterously when he disagreed with someone; corrected his subordinates in public; and told his subordinates that they were stupid. (Army Facts ¶¶ 50, 51.) Fee met with each member of the section individually to discuss these complaints and later learned that Petron had received similar complaints when he worked at other sections within the division, as well as at other facilities outside the division. (*Id.* ¶¶ 52, 53.)

Also in July 2000, Goodum gave Fee a list of problems and proposed solutions relating to Petron. The solutions included "[g]ive credit where credit is due"; "Petron should take time to learn each one of my functions in detail"; "Petron should let me know his specific functions and his role";

and "[p]ersonal development and training development should always be encouraged." (Pl. Facts ¶ 107; Ex. 44 to Pl. Facts; Army Fact Resp. ¶ 107.) On August 24, 2000, Fee formally counseled Petron regarding his poor communication and listening skills. According to Fee, ensuring that Petron "acted professionally" towards Goodum and all employees was "high on [his] radar screen." (*Id.* ¶ 95; Army Fact Resp. ¶ 95; Fee Dep., at 30-31; Pl. Facts ¶ 132.) Fee also stated that Petron was "defensive" during the counseling session. (Pl. Facts ¶ 133.)

Over the following three months, Fee "often" reminded Petron of his need to improve his communication skills and directed Petron to meet with members of his staff to improve the overall communication within the section. (Army Facts ¶¶ 54-56; Fee Dep., at 13.) In that regard, Petron held at least two open-forum meetings, at which Goodum and other employees stated their concerns about Petron's management style.[6] Constance Storer stated that she was surprised to see that Petron remained calm during the meetings, took notes, and appeared to listen to the employees. (*Id.* ¶¶ 57, 58.) Cordell Rich observed that after the meetings, Petron "made very, very strong efforts to try and correct his behavior." Rich stated that Petron "would modify, at least in some respects, his behavior that [the employees] told him was offensive to [them], or [they] told him [they] were concerned about," and Rich saw a "significant change in [Petron's] behavior towards [the employees]" over the course of a couple of years. (*Id.* ¶ 59.) Fee also measured Petron's progress based on the number of complaints he received "from outside of the headquarters, from lower subordinate units, from other staff sections within the division headquarters as well as from the section itself." (Pl. Facts ¶ 186.)

---

[6]     It is not clear when Petron held these open-forum meetings. Presumably, they occurred shortly after Fee counseled him in August 2000, but after Goodum had returned from maternity leave.

## D. Goodum's Maternity Leave

On June 22, 2000, Goodum gave birth to a healthy baby and began her maternity leave. Shortly thereafter, on July 31, 2000, Goodum invoked her FMLA rights and she and Petron began to argue about their different interpretations of the statute. (Army Facts ¶¶ 29, 30; Pl. Facts ¶¶ 189, 191.) Goodum claims that Petron believed she had to begin her twelve weeks of leave on the day the baby was born. Goodum, on the other hand, wanted to exhaust her three weeks of accrued annual and medical leave before beginning the twelve weeks of FMLA leave. (*Id.* ¶¶ 31, 32; Pl. Facts ¶ 147.) On August 10, 2000, Goodum began leave without pay under the Act. (Pl. Facts ¶ 192.) One week later, on August 18, 2000, Goodum attended an Army reserve drill training session and complained to Marlett about Petron's interpretation of the FMLA. Mr. Skon,[7] CPOC, Personnel Representative and CXO at Fort McCoy, met with Goodum, Petron, and Marlett to explain the FMLA regulations. (*Id.* ¶¶ 152, 153.) Marlett instructed Goodum and Petron to work out a reasonable schedule by the end of the day that would accommodate the needs of both Goodum and the Army. (Army Facts ¶ 33; Pl. Facts ¶¶ 131, 139.) Goodum believed that she was allowed to request leave for the birth of her child up to one year after she gave birth. (Pl. Facts ¶ 154.) Nevertheless, Goodum and Petron agreed that Goodum would remain on maternity leave until September 6, 2000. She would then return to work three days per week until January 24, 2001, at which time she would return to work full-time. (Army Facts ¶¶ 34, 35.) Goodum claims that she felt pressured to accept this schedule and did so in an effort to show good faith. (Pl. Facts ¶ 195.)

Goodum claims that after she complained to Marlett in August 2000, Petron increased her workload and created a hostile work environment. By way of example, Goodum asserts that Petron "insisted on assigning [her] the task, at seven months pregnant, of gathering information from five

---

[7] The parties do not provide Mr. Skon's first name.

9

different states and headquarters, formatting it into an established format and coordinating the division's $20 million budget." (*Id.* ¶¶ 123, 124.) The Army does not dispute that Petron assigned Goodum this time-consuming and laborious task, but notes that she gave birth on June 22, 2000 and could not have been seven months pregnant at the time. (Army Fact Resp. ¶ 124; Army Reply, at 4.)

## E.    Petron's "Smear Campaign"

Goodum claims that while she was telecommuting and out on maternity leave, Petron began a "smear campaign" against her by referring to her pregnancy as a showstopper and stating that she had abused the system and was not a team player. (Army Facts ¶ 36.) Colonel Lynn Barden testified that she heard Petron state that Goodum was "not a team player, wasn't supporting the unit, and was not doing her job." (Pl. Facts ¶ 71; Transcript of Factfinding Conference, at 177.) Major General Allen admits that characterizing a soldier as "not a team player" could jeopardize her career in the "short term." (*Id.* ¶ 328.) Aside from Barden's one comment, however, Goodum's only evidence of a smear campaign is hearsay testimony from co-workers who purportedly told her that they heard Petron make negative statements about her. (*Id.* ¶¶ 54, 57, 58, 62-64; Transcript of Factfinding Conference, at 31.) As noted, Petron did complain to Marlett that he did not have enough control over telecommuting and that it would be difficult to monitor Goodum's work performance. Petron also stated that he had a "personality conflict" with Goodum and that she did not seem to understand that she was not the person in charge. (*Id.* ¶¶ 55, 56.) In Petron's view, however, there was never a question that Goodum was doing her assigned work because he was in constant email and telephone contact with her, and because it would be readily apparent if Goodum did not pay bills or transfer and allocate money. (Army Facts ¶¶ 27, 28; Army Fact Resp. ¶ 82.) In addition, though Goodum believes that Petron was upset with

her for being pregnant and not coming to work, she also believes that he would have been just as upset with her if she did not come to work because she had chickenpox. (*Id.* ¶¶ 37, 38.)

### F.    Goodum's Workload

As previously agreed, Goodum returned to work full-time on January 24, 2001. (Pl. Facts ¶ 196.) On February 23, 2001, she wrote a "Memorandum for the Record" entitled "Workload and Responsibilities." (Army Facts ¶ 60; Ex. O to Army Facts.)  In the memorandum, Goodum stated that Petron often asked her to perform tasks that she believed were his responsibility, and that "[t]he bottom line for [her] was that [Petron's] continuous interruptions of [her] daily work [was] causing [her] work to go by the waist [sic] side." (*Id.*)  According to Goodum, Petron's stated explanation for assigning her his tasks was that he had covered her tasks while she was working from home and then out on maternity leave. (*Id.*; Pl. Facts ¶ 176.)  Goodum indicated in the memorandum that she had warned Petron earlier that day that she would complain to the Inspector General if he made such comments again.  Goodum explained that as a former EEO advisor, she knew that the "first responsibility is that of the offended individual to voice when he or she feels her/his rights are being violated." (*Id.*)  Goodum claims that she also made verbal complaints to Fee and Burnett regarding her workload and Petron's derogatory comments about her maternity leave, and that she threatened to file an EEO complaint. (Pl. Facts ¶ 129.)  According to Goodum, Burnett told her to "hang in there" and warned that "[y]ou don't want to be blacklisted."[8] (Army Fact Resp. ¶ 197.)

Shortly thereafter, in early March 2001, Petron began complaining to Fee that Goodum was not doing her job in an effective manner. At the same time, Goodum began complaining to Fee

---

[8]    Goodum directs the court to her October 24, 2004 affidavit as evidence that Burnett threatened to "black list" her if she filed an EEO complaint. (Pl. Facts ¶¶ 197, 198, 202.)  To the extent the affidavit contradicts Goodum's earlier deposition testimony from March 16, 2004, it cannot be relied upon as a basis for summary judgment. *See, e.g., Brill v. Lante Corp.*, 119 F.3d 1266, 1274 n.4 (7th Cir. 1997) ("[W]e generally discount – indeed, disregard – an affidavit that is in conflict with a party's deposition testimony.")

that Petron was giving her too much work to complete. (Army Facts ¶ 62.) At a March 9, 2001 U.S. Army Reserve annual financial management conference in College Park, Georgia, Fee spent more than an hour with Petron and Goodum attempting to mediate their disagreement. After the counseling, Petron's conduct improved, but only for short periods of time. In response to Goodum's complaints, Fee reviewed her workload and determined that it was very similar to the workload performed by other budget analysts at other facilities. Fee also concluded that the goals Petron set for Goodum were attainable. (Id. ¶¶ 63-65; Army Fact Resp. ¶ 86; Pl. Facts ¶¶ 135, 136.)

## G. Goodum's Job Applications

On May 16, 2001, Goodum applied for a position "on the military side of the house" as an EEO G1. (Pl. Facts ¶¶ 208, 209; Army Fact Resp. ¶ 208.) When Goodum asked Petron to transfer, he "said no" because he "saw the work load increasing." (Id. ¶ 211.) In October 2001, Goodum applied for a Resource Management Officer ("RMO") position at the 416th Engineer Command. That position is comparable to the one held by Petron at the 85th Division and would have been a promotion for Goodum. (Id. ¶ 66.) Colonel Gieb[9] of the 416th Engineer Command interviewed Goodum for the job. (Pl. Facts ¶ 250.) He also called Petron to inquire about Goodum's qualifications. Petron told Gieb that Goodum had excellent technical skills but needed more supervisory skills. (Army Facts ¶ 67; Pl. Facts ¶¶ 251, 254.)

While her application for the RMO position was still pending, Goodum learned in November 2001 about an opening at her level in the personnel section of the 85th Division. (Id. ¶ 71.) Prior to that time, Goodum had complained to Audrey Strubbe, the top civilian employee in the personnel section, that Petron was "dumping" work on her and that she was unhappy. (Pl. Facts ¶ 184.) In addition, Goodum had started experiencing laryngitis; prolonged colds; swollen eyes, nose and

---

[9]     The parties do not provide Colonel Gieb's first name.

ears; bladder infections; and diabetes. (*Id.* ¶ 291.) Goodum talked to Strubbe about the personnel position and claims that Strubbe was very excited about her interest and stated that she "would love for [Goodum] to come downstairs" and work in her section. Goodum asked Strubbe whether she could wait to fill the position because Goodum had not yet heard about the RMO position. Strubbe told Goodum that she could wait about a month, but that Goodum would have to "rate out" for the position – i.e., "fill out a packet with all of [her] qualifications." (*Id.* ¶¶ 72-76; Goodum Dep., at 130.) Strubbe testified that employees who want to "lateral into a position" must submit a packet in order to get qualified, and that employees who fail to submit a packet "can't get lateraled into that position." (*Id.* ¶ 78.)

Goodum claims that when she told Petron and Silva that she wanted to transfer, both men became upset. (Pl. Facts ¶ 220-23.) In any event, Goodum never submitted a packet containing her qualifications for the personnel position and Beverly Kozlowski, who did submit such a packet, was ultimately hired. Goodum insists that Strubbe told her she did not need to submit a qualifications packet but, as noted, she also admits that Strubbe told her she had to "rate out" for the position. (*Id.* ¶¶ 231, 232; Goodum Dep., at 130.) Strubbe says that if Goodum had submitted a qualification packet, Strubbe would have had no problem placing her in the position. (*Id.* ¶¶ 79, 80.) Indeed, Burnett told Goodum that she "deserve[d]" the position if she wanted it. (Pl. Facts ¶ 219.) On February 4, 2002, Goodum learned that the RMO position at the 416th Engineer Command went to Debra McDonald. Goodum believes she did not get the job because of Petron's comments to Gieb about her lack of supervisory skills, but she admits that she does not know what criteria the hiring official at the 416th used to select the successful candidate. (Army Facts ¶¶ 68, 69; Pl. Facts ¶¶ 255, 285.)

## H.    Further Counseling for Goodum and Petron

In September 2001, Sherry Toberman replaced Wayne Marlett as CXO of the 85th Division. (Pl. Facts ¶ 31; Army Fact Resp. ¶ 31.) Sometime thereafter, Goodum told Toberman that Petron kept throwing in Goodum's face the fact that he had done a lot of her work while she telecommuted. Toberman says that she spoke with Petron and instructed him to stop referring to that event. Petron responded that he "didn't realize he did it that often" but "if he did, he would make an effort to stop." (*Id.* ¶ 76; Army Fact Resp. ¶ 75.)

Also in September 2001, Fee retired and was replaced by Colonel Michael Silva. Silva changed the employees' work schedules in the section and made everyone's days longer to account for an increased workload following the events of September 11, 2001. (*Id.* ¶¶ 81-83; Pl. Facts ¶ 27.) On November 1, 2001, Silva had an introductory meeting with Goodum during which she complained that she did not like Petron and considered him to be verbally abusive and a bad manager. Around the same time, Petron complained to Silva that Goodum did not get her work done, complained excessively, and was disruptive. (*Id.* ¶¶ 84, 85.) Silva "counseled, monitored and coached both Mr. Petron and Ms. Goodum on their interactions with each other, and how they could each contribute a little bit to a better total environment." (*Id.* ¶ 86.)

In addition to complaining about Petron's management style, Goodum also told Silva that she was overworked and had "too many things on her plate." When Silva asked her whether she was required to perform tasks not normally required of someone in her position, however, Goodum was "vague" and stated only that "there were things she had to clean up . . . ." (*Id.* ¶ 87; Silva Dep., Ex. P to Army Facts, at 11.) At some point, Petron suggested that Goodum and Edwards cross-train so that Edwards could assist her with the OMA fund and she could reduce her workload by taking on some of the RPA fund responsibilities. Goodum rejected the proposal because she did not want to work on the RPA fund. (*Id.* ¶ 88.)

14

## I. Goodum's Employee Objectives

Once a year, Petron prepared a list of objectives for each of his subordinates after discussing with his supervisor the section's overall objectives. Petron generally emailed each employee a copy of his or her prior year objectives and asked for feedback for the coming year. (*Id.* ¶¶ 89, 90.) Petron emailed Goodum a final list of objectives on December 20, 2001. One week later, on December 28, 2001, Goodum sent Petron and Silva an email message stating that she would not sign the objectives because they were unattainable and prepared without her input. (*Id.* ¶ 91; Email from R. Goodum to C. Petron of 12/28/01, Ex. Q to Army Facts; Pl. Facts ¶ 299.) Silva asked Petron why he had given Goodum a list of objectives without getting her input, and Petron explained that Goodum was the only employee in the section who failed to respond to his email seeking feedback. (*Id.* ¶¶ 92, 93.)

Petron acknowledges that he increased Goodum's "civilian performance objectives" in order to "obtain greater output." (Pl. Facts ¶ 118.) According to Audrey Strubbe, the supervisor has final approval over the objectives, and the Comptroller makes the final decision in the event of an impasse between the employee and the supervisor. (*Id.* ¶ 120.)

## J. Goodum's Physical Training

All dual-status employees in the 85th Division were granted three hours per week for physical training ("PT") so that they could stay in shape and pass their military training tests. The 85th Division had its own gym on the premises, but an unwritten policy allowed employees to perform PT off-site. Goodum opted to conduct her PT at home and Edwards, similarly, performed his physical training at a private health club. (Army Facts ¶¶ 94, 95; Pl. Facts ¶¶ 156, 159, 160, 162.) On December 28, 2001, Goodum left work early without permission to do her PT. Petron attempted to issue Goodum a formal counseling statement on December 31, 2001, but she asked to have a witness present, and Petron agreed. (*Id.* ¶ 96; Developmental Counseling Form, Ex. T

15

to Army Facts.) Later that day, Goodum sent an email message to Major General Allen to request "a possible lateral transfer" to the personnel section. (Id. ¶ 100; Ex. R to Army Facts.) Two days later on January 2, 2002, Goodum contacted the Army's EEO office about filing a complaint of discrimination. (Id. ¶ 101.) Renee Johnson from EEO contacted Goodum the next day to inform her of her rights and to interview her about her claims. (Pl. Facts ¶ 309.) Goodum filed a formal EEO complaint on February 12, 2002, alleging race, sex, and physical handicap discrimination, as well as reprisal. (Ex. 165 to Pl. Facts.)

On January 7, 2002, Petron sent Goodum an email message inquiring why she had left the office at 2:00 p.m. that day. (Army Facts ¶ 102; Ex. S to Army Facts.) Goodum responded the next day, stating that she had left for PT. Petron replied to Goodum's email message stating that Goodum had to conduct her PT on the premises, and attaching a "Memo for the Record" to that effect he had prepared on December 31, 2001. (Id. ¶¶ 103, 104; Exs. S and U to Army Facts.) In response, Goodum emailed Petron accusing him of discriminating against her with respect to her PT and attempting to "harass [her] because [she] want[ed] to leave the section." (Id. ¶ 105; Ex. S.)

Also on January 8, 2002, Petron asked Audrey Strubbe to act as a witness while he issued Goodum's counseling statement, even though he knew Goodum was trying to transfer to Strubbe's section. (Id. ¶ 107; Pl. Facts ¶ 239.) According to Strubbe, the meeting was very uncomfortable for all three individuals, and though Petron kept his temper, Goodum did not. (Id. ¶¶ 108, 109.) Strubbe also indicated that if she were an impartial observer, "not knowing Mr. Petron or Ms. Goodum prior to counseling," she would have thought Goodum was "totally out of control and insubordinate." (Pl. Facts ¶ 240.)

The counseling statement noted that civilian employees could only leave early if they had permission from a supervisor, and that Goodum did not have permission on the date in question because she had not yet completed a project. Petron indicated that one purpose of the counseling

statement was to establish definitive guidance regarding Goodum's PT plan and hours of work. (Army Facts ¶¶ 97-99; Ex. T.) Goodum submitted a rebuttal to the counseling statement claiming that she could not have completed the project even if she had worked all weekend, and stating that "I had my coat on at this point, I told everyone to have a nice weekend, and [I] left for the day." (Id. ¶ 110; Ex. W to Army Facts.)

The next day, on January 9, 2002, Silva issued a policy stating that all employees in the section would be required to conduct PT on the premises. (Id. ¶ 106; Ex. V to Army Facts.) Goodum believes that all employees except her were exempt from the policy, but Edwards testified that he was no longer allowed to do PT away from the facility after that date. (Pl. Facts ¶ 169; Army Fact Resp. ¶ 169.) Silva also met with Goodum and Colonel Thomas Burnett[10] "in an attempt to facilitate a resolution to this conflict" regarding Goodum's hours and workload. (Army Facts ¶ 111; Silva Dep., at 31.) During the meeting, Silva asked Goodum to prepare a list of her core duties and to explain the problems that existed with her workload. Goodum submitted the list on January 14, 2002. (Id. ¶¶ 112, 113.)

## K. Goodum's Continued Workload Complaints

On January 11, 2002, Goodum met with Major General Allen to discuss a transfer to the personnel section. At the meeting, Goodum gave Allen a "Memorandum for Record" stating that she had filed an EEO complaint because Petron was harassing her in retribution for her attempts to leave the section. (Id. ¶¶ 114, 115; Ex. Z to Army Facts.) Allen read the entire four-page document in Goodum's presence and asked her questions as he went through it. In response to Goodum's request for a transfer, Allen told her the procedure for filling vacancies at the Division. With respect to her discrimination complaint, Allen stated that he would take her concerns under advisement but that based on his training, he did not think the items she listed rose to the level of

---

[10]     Burnett became Chief of Staff of the 85th Division in July 2000. (Army Fact Resp. ¶ 92.)

a hostile work environment. (*Id.* ¶¶ 116-18; Pl. Facts ¶¶ 264, 320.) Sherry Toberman testified that Allen later told her that "we needed [Goodum] most in [Petron's] section" and he "wanted her to stay in that section." (Pl. Facts ¶ 264.)

On January 28, 2002, Goodum sent Allen, Burnett, Silva, Petron, and Toberman an email message complaining that she had emailed Petron on January 14 with her list of duties but had not yet heard back from him. Burnett responded the next day stating that Silva and Toberman were out of town. (Army Facts ¶¶ 119-21; Ex. AA to Army Facts.) Burnett asked Goodum to remain professional and reminded her that "these are exciting times at the Div with our country at WAR." (*Id.* ¶¶ 120, 121; Ex. AA to Army Facts.) Petron responded to Goodum's email message later that morning, stating that he had been out of town for 12 days between January 12 and 24, 2005 and had just read her January 14 email the night before. Petron informed Goodum that another reservist, Sergeant Ordija, had expressed interest in helping her complete some of her current tasks, and strongly recommended that she contact Ordija for assistance. (*Id.* ¶ 122; Ex. AA.) Goodum chose not to contact Ordija, however, because she thought it would take too much time to train him. (*Id.* ¶ 123.) According to Goodum, Ezella Vargas and Cordell Rich asked Petron if they could help Goodum, but he said no. (Pl. Facts ¶ 175.)

## L. Goodum's Medical Leave

Also on January 29, 2002, Goodum submitted a request for medical leave supported by a note from Dr. Jerome Hong dated January 28, 2002. In the note, Dr. Hong stated that Goodum was a patient under his care; that she was suffering from an unidentified "medical condition that is due in part to the conditions at her workplace"; and that he recommended that she take two weeks off work to assist with her medical therapy. (Army Facts ¶ 124; Exs. BB and CC to Army Facts; Pl. Facts ¶ 340.) On February 13, 2002, Goodum sent Petron a facsimile stating that she needed additional advanced sick leave and medical leave, and designating Attorney David E.

Neely, Ph.D. and Dr. Hong as representatives to answer any questions. (Ex. 166 to Pl. Facts.) On February 15, 2002, Silva sent Goodum a memorandum acknowledging receipt of her request for medical leave. Silva was unable to approve the request, however, because Dr. Hong and Attorney Neely said they did not have Goodum's authorization to provide information about her medical condition necessary to process the request. (Army Facts ¶ 125; Ex. DD to Army Facts; Pl. Facts ¶ 343.) Silva stated that he expected to see Goodum at work on February 19, 2002, but she did not report for duty. (*Id.* ¶ 126; Ex. DD.)

On February 28, 2002, Petron sent Goodum a Request for Medical Documentation. In that request, Petron stated that he had advanced Goodum 80 hours of sick leave based on Dr. Hong's vague January 28 note, but that she must submit additional medical documentation to support her continued absence or face disciplinary action. (*Id.* ¶ 127; Ex. EE to Army Facts; Pl. Facts ¶ 334.) Attached to the request was a Medical Evaluation form asking that Goodum's physician provide, pursuant to 5 C.F.R. § 339.104,[11] information regarding the history of her condition, her diagnosis, her prognosis, and her need for any workplace accommodation. (*Id.* ¶ 128; Ex. EE.) Neely responded to the medical request on March 7, 2002, asserting that Petron did not have a right under the cited regulation to request information about Goodum's medical condition. (*Id.* ¶ 129; Ex. FF to Army Facts.) Neely did, however, submit a February 21, 2002 note from Dr. Riaz Baber stating that Goodum was under his care with a good prognosis, but that "[i]n my clinical opinion, she will be on medical leave for two more weeks, as she is suffering from Major Depression." (*Id.* ¶ 130; Note from R. Baber of 2/21/02, Ex. FF to Army Facts.)

On March 2, 2002, Dr. Hong prepared a letter detailing Goodum's ailments, including fatigue, myalgias, paresthesias, and mood alterations dating back to March 2001. Dr. Hong indicated his belief that her depression symptoms "directly stem from her hostile workplace

---

[11]    Section 339.104 addresses medical qualification determinations under the civil service regulations.

environment."[12] (Ex. 257 to Pl. Facts.) On March 8, 2002, Dr. Baber prepared a handwritten note stating that Goodum had been under his care since February 17, 2002. Dr. Baber indicated that Goodum was admitted to the hospital "very depressed, extremely anxious and suicidal." He further stated that Goodum's "[d]isorder was aggravated by employment because patient thinks she is unfairly treated by work." (Pl. Facts. ¶ 341; Ex. 257 to Pl. Facts.) There is no evidence, however, that anyone ever sent either Dr. Hong's or Dr. Baber's letters to the Army.

On May 19, 2002, Goodum sent Major England the doctor's prescription for medical leave. (Ex. Vol. 6 to Pl. Facts, at T37.) Approximately one month later, on June 17, 2002, Dr. Shobha Sinha issued Goodum another prescription to remain off work until August 26, 2002. (Pl. Facts ¶ 349.) Goodum sent Dr. Sinha's note to Petron on June 19, 2002. (Ex. Vol. 6 to Pl. Facts, at T40.) On August 26, 2002, Dr. Sinha wrote a letter stating that "[f]or the health and welfare of Ms. Goodum I recommend that she does not have any contact with Charles Pet[r]on and her place of employment." (Pl. Facts ¶ 355.) On December 9, 2002 and February 10, 2003, Dr. Sinha wrote two additional notes stating that Goodum needed to remain off work "at this time." (Ex. 257 to Pl. Facts.) On December 12, 2002, Petron sent Goodum a Notice of Proposed Removal from Budget Analyst position based on her inability to maintain membership in the reserves. (Ex. 208 to Pl. Facts.) Goodum responded with a letter dated December 29, 2002, asking that she be allowed to keep her position pending the outcome of her EEO investigation, "until I find another position and most important until I am medically able to return to work." (Ex. 209 to Pl. Facts.) It is undisputed that Goodum remained on a medical leave of absence from January 29, 2002 until at least March 16, 2004, the date she was deposed in this lawsuit. (Army Facts ¶ 131.)

During her deposition, Goodum testified that she suffers from numerous disorders, including fibromyalgia, severe chronic fatigue syndrome, severe depression, and muscle spasms. According

[12]     Dr. Hong prepared a nearly identical letter on April 16, 2003 but there is no evidence that it was ever sent to the Army. (Ex. 257 to Pl. Facts.)

to Goodum, these conditions cause her severe pain and prevent her from doing "much of anything." Goodum's eye reportedly twitches so badly that she cannot read for hours at a time, and she has muscle spasms in her hands that prevent her from writing or using a computer. Goodum stated that she finds everything overwhelming and spends most of her days going to the doctor and sleeping. As of March 16, 2004, Goodum felt absolutely incapable of performing the duties of a full-time budget analyst and could not anticipate any date in the future when she might feel capable of returning to work. (*Id.* ¶¶ 132-34; Pl. Facts ¶ 372.)

## M.    Goodum's Lawsuit

As noted, Goodum filed a formal complaint of discrimination with the EEO Office on February 12, 2002, shortly after she received the requisite Final Interview Letter on February 7, 2002. The EEO Office accepted the case for investigation on February 27, 2002 and held a factfinding conference on August 27 and 29, 2002. On November 20, 2002 the EEO Office issued a Report of Investigation finding "no verification of any observed behaviors characterized as derogatory toward [Goodum] based on her sex, disability or EEO activity." The Report also noted that Goodum had withdrawn her claim of race discrimination during the factfinding conference. (Ex. 207 to Pl. Facts.)

On December 18, 2002, Goodum requested appointment of an Equal Employment Opportunity Commission ("EEOC") Administrative Judge to hear her case. The EEOC issued a scheduling order on March 31, 2003. On May 14, 2003, Goodum submitted her Notice of Intent to file a civil action pursuant to 29 C.F.R. § 1614.310(i) and 5 U.S.C. § 7702(e)(1)(c). On May 15, 2003, the EEOC remanded the case to the Agency for a final decision. The same day, Goodum filed this lawsuit alleging sex, race, pregnancy, and disability discrimination; sexual harassment; violation of 42 U.S.C. § 1981; violation of the FMLA; and retaliation and reprisal.

On August 21, 2003, Goodum amended the complaint, eliminating her claim under § 1981 but adding claims for intentional infliction of emotional distress ("IIED"); breach of oral contract and fraud; and fraudulent inducement. On February 2, 2004, the district court dismissed Goodum's claims for retaliation and reprisal; IIED; breach of contract and fraud; and fraudulent inducement; as well as all claims relating to Goodum's military service.[13] (Minute Order of 2/2/04, Doc. No. 15.) Shortly thereafter, on April 5, 2004, the parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Both parties now seek summary judgment on the remaining claims for race, sex, disability, and pregnancy discrimination; sexual harassment; violation of the FMLA; and retaliation under Title VII.[14]

## DISCUSSION

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering cross-motions for summary judgment, the court must view the evidence in a light most favorable to the party opposing the motion under consideration. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001). The court's function in ruling on a motion for summary judgment is not to weigh the evidence, but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Where factual

---

[13]     Goodum makes repeated reference to incidents relating to her military service on the theory that it constitutes evidence of a pattern of discrimination. To the extent civil rights statutes are generally inapplicable to members of the armed forces, the court declines to consider the evidence in deciding summary judgment. *See Gordon v. Illinois Army Nat'l Guard*, 215 F.3d 1329 (Table) (7th Cir. 2000) (noting that "the special relationship between the military and its soldiers precludes the application of various federal statutes to the military . . .")

[14]     Effective July 31, 2004, the Army removed Goodum from her budget analyst position on the grounds that she remained unavailable for work. Goodum responded by filing a second federal lawsuit on October 20, 2005 (No. 05 C 6034) alleging, among other things, race, sex, and disability discrimination arising from her wrongful discharge. That case is currently pending before Judge Norgle of this court.

matters are in dispute, the court is required to credit the nonmovant's version of events. *Hostetler v. Quality Dining, Inc.,* 218 F.3d 798, 802 (7th Cir. 2000). The nonmoving party must do more, however, than demonstrate a factual dispute; she must offer evidence sufficient to support a verdict in her favor. *Basith v. Cook County,* 241 F.3d 919, 926 (7th Cir. 2001). Employment discrimination cases are inherently fact-intensive, but the court is not required to "scour the record" in an effort to assist the plaintiff in avoiding summary judgment. *Greer v. Board of Ed. of City of Chicago,* 267 F.3d 723, 727 (7th Cir. 2001).

Before turning to the merits of summary judgment, the court notes that Goodum's "arguments" largely consist of repeating the facts of the case without meaningful analysis.[15] "A judge is the impartial umpire of legal battles, not a plaintiffs' attorney. [S]he is neither required to hunt down arguments plaintiffs keep camouflaged . . . nor required to address perfunctory and undeveloped arguments." *Williams v. Eastside Lumberyard and Supply Co.,* 190 F. Supp. 2d 1104, 1114 (S.D. Ill. 2001) (citing *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)) ("Judges are not like pigs, hunting for truffles buried in briefs.") In addition, "[a] plaintiff's recital of the facts of the case triggers no duty on the part of the judge to research, construct, and further research the best legal arguments [s]he can for that fact-reciting party." *Id.* Thus, the court will address only those arguments properly discernible from the briefs.

## I.    FMLA

The Army argues that Goodum does not have a private right of action under the FMLA. The FMLA grants both private and federal employees an entitlement to periods of leave for certain enumerated circumstances, including the birth of a child and related periods of disability. Title I of the Act governs leave for private employees and federal employees not covered by Title II – e.g., postal service employees; certain District of Columbia employees; and physicians, dentists, and

---

[15]    Goodum's motion for summary judgment spans 44 pages, and her response in opposition to the Army's motion for summary judgment is an additional 40 pages.

nurses in the Department of Veterans Affairs. 29 U.S.C. § 2612(a)(1); 5 U.S.C. § 6301(2)(B); 5 U.S.C. § 6381(1)(A). Title I expressly provides that an employee may bring a civil action against the employer in federal or state court. 29 U.S.C. § 2617(a)(2). Title II contains no similar provision. Goodum does not dispute that she is a Title II federal civil service employee. (Pl. Resp., at 4.)[16] Thus, she has no claim for relief under the FMLA and the Army's motion for summary judgment is granted. *See Mann v. Haigh*, 120 F.3d 34, 37 (4th Cir. 1997) ("No unequivocal waiver of immunity exists in Title II, and, consequently, the omission of a provision in Title II similar to that in Title I creating a private right of action is treated as an affirmative congressional decision that the employees covered by Title II of the FMLA should not have a right to judicial review of their FMLA claims."); *Russell v. U.S. Dep't of the Army*, 191 F.3d 1016, 1019 (9th Cir. 1999) (same); *Kallen v. U.S. Dep't of Defense*, No. 1:03-CV-1634-JDTTAB, 2004 WL 2137636 (S.D. Ind. Aug. 11, 2004) (same).

## II.    Race Discrimination

A plaintiff alleging discrimination by a federal agency "must exhaust [agency] remedies before [s]he can bring suit." *McGuinness v. U.S. Postal Serv.*, 744 F.2d 1318, 1320 (7th Cir. 1984). As noted, Goodum withdrew her race discrimination claim during the factfinding conference. (Ex. 207 to Pl. Facts.) Thus, she has not exhausted her administrative remedies with respect to that claim and it must be dismissed. Goodum disagrees, arguing that the race discrimination claim is "like or reasonably related to" her claims of a hostile work environment; sex, pregnancy, and disability discrimination; and retaliation. (Pl. Resp., at 3.) In support of this argument, Goodum cites *Collins v. Executive Airlines, Inc.*, 934 F. Supp. 1378 (S.D. Fla. 1996), in which the plaintiff filed a 1993 charge alleging both race discrimination and retaliation, and a 1994 charge alleging only retaliation. The 1993 charge "was resolved" two months before the plaintiff filed the 1994

---

[16]    Plaintiff's Response to Defendant's Motion for Summary Judgment is cited as "Pl. Resp., at ___."

charge. *Id.* at 1379. The plaintiff filed suit in federal court pursuant to the 1994 charge, alleging retaliation and race-based hostile work environment. The defendant argued that the race claim exceeded the scope of the 1994 charge, but the plaintiff insisted that the claim was "like or reasonably related to" the allegations of retaliation. *Id.* at 1380. In allowing the race claim to proceed, the court noted that "a claim for racial or other discrimination may be reasonably related to a subsequent claim of retaliatory conduct based on the earlier charges of discrimination." *Id.* at 1381.

Unlike the plaintiff in *Collins*, Goodum filed a single complaint that included a race discrimination claim along with her claim for retaliatory discharge. That is, the retaliation claim is not based on her decision to file an earlier charge of race discrimination. "The purpose of requiring exhaustion of administrative remedies in Title VII cases is to place the employer on notice of an impending suit that he can try to head off by negotiating with the complainant." *Horton v. Jackson County Bd. of County Comm'rs*, 343 F.3d 897, 899 (7th Cir. 2003). By voluntarily withdrawing the race claim, Goodum prevented the Army from negotiating that claim, and failed to exhaust her administrative remedies. The Army's motion for summary judgment on the race discrimination claim is granted.

## III. Rehabilitation Act

Goodum claims that the Army violated the Rehabilitation Act by failing to accommodate her pregnancy- and work-related disabilities, and by discriminating against her on the basis of those disabilities. To recover under the Rehabilitation Act, Goodum must establish that (1) she suffers from a disability; (2) she is qualified to perform the essential functions of the job in question, with or without reasonable accommodation; and (3) she has suffered an adverse employment action as a result of her disability. *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005). The Army argues that Goodum cannot establish the second element based on her own testimony that

'she suffers from a variety of conditions that cause her severe pain and prevent her from working as a budget analyst. Goodum stated that her eye twitches so badly that she cannot read for hours at a time. She also has muscle spasms in her hands that prevent her from writing or using a computer, which constitutes 80% of a budget analyst's job. Goodum stated that she finds everything overwhelming and spends most of her days going to the doctor and sleeping. As of March 16, 2004, Goodum felt absolutely incapable of performing the duties of a full-time budget analyst and could not anticipate any date in the future when she might feel capable of returning to work. (Army Facts ¶¶ 132-34; Pl. Facts ¶ 372.)

Goodum responds that her "testimony regarding her condition was only related to her then current position" as of the date of her deposition. (Pl. Resp., at 31.) Significantly, however, Goodum has not offered any evidence regarding her current medical condition, much less evidence that demonstrates her ability to perform the essential functions of her job. Nor does Goodum indicate that she is capable of returning to work if she is "remove[d] . . . from the wrath of Mr. Petron." (Id. at 37.) Goodum's doctor's notes consistently confirmed that she was unable to return to work under any circumstances. Most recently, Dr. Hong wrote a September 10, 2004 note stating that Goodum "suffers from multiple medical conditions that have prevented her from working full-time." (Ex. 257 to Pl. Facts, at 47.) Moreover, the Army granted Goodum a medical leave of absence for more than two years, from January 29, 2002 until at least March 16, 2004. (Army Facts ¶ 131.) This satisfies any requirement that the Army provide Goodum a reasonable accommodation. *Basith*, 241 F.3d at 932 (medical leave of absence qualified as a reasonable accommodation); *Corder v. Lucent Technologies Inc.*, 162 F.3d 924, (7th Cir. 1998) (medical leave of absence is a reasonable accommodation even if not the accommodation the employee requests or prefers); *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 381 (7th Cir. 2003) ("Inability to work for a multi-month period removes a person from the class protected by the [Rehabilitation Act]."); *Foley*

v. City of Lafayette, 359 F.3d 925, 928 (7th Cir. 2004) ("Rehabilitation Act claims are analyzed under the same standards as those used for ADA claims.") (internal quotations omitted).

For similar reasons, Goodum cannot prevail on her claim of disability discrimination. To establish a prima facie case of discrimination, Goodum must show that (1) she was disabled; (2) the Army was aware of her disability; and (3) she was a qualified individual who, with or without reasonable accommodation, could perform the essential functions of her job. *Basith*, 241 F.3d at 927. Goodum has no evidence that she is qualified to perform the essential functions of her job. To the contrary, she herself testified that she is absolutely incapable of performing the duties of a full-time budget analyst – including reading, writing, staying awake, or using a computer – and cannot anticipate any date in the future when she might feel capable of returning to work. *See Sutton v. Potter*, No. 02 C 2702, 2004 WL 603477, at *7 (N.D. Ill. Mar. 22, 2004) (quoting *Byrne*, 328 F.3d at 381) ("Since 'not working is not a means to perform the job's essential functions,' a total inability to work 'means that one is not qualified.'") In addition, Goodum was given a medical leave of absence exceeding two years in length, and she cannot demonstrate that the Army's reason for not returning her to work – her own testimony that she is incapable of working – is a pretext for discrimination. *See Dyrek v. Garvey*, 334 F.3d 590, 598 (7th Cir. 2003) (proffered reason for an employment decision is pretextual if it is "factually baseless," not the actual motivation, or insufficient motivation; "[i]t is not enough to show the decision was 'mistaken, ill considered, or foolish.'") The Army's motion for summary judgment on Goodum's Rehabilitation Act claim is granted.

## IV.    Gender and Pregnancy Discrimination

Goodum argues that the Army discriminated against her because of her sex and pregnancy. Title VII prohibits discrimination against any individual "because of such individual's . . . sex . . ." 42 U.S.C. § 2000e-2(a)(1). The Pregnancy Discrimination Act of 1978, which amended Title VII,

provides that the term "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). To establish a claim of sex or pregnancy discrimination, Goodum may rely on either the direct or indirect method of proof. Under the direct method, Goodum must either present direct evidence which, if believed by the finder of fact, "will prove the particular fact in question without reliance upon inference or presumption," or circumstantial evidence that establishes a "convincing mosaic" of discrimination. *Volovsek v. Wisconsin Dep't of Agriculture, Trade and Consumer Protection*, 344 F.3d 680, 689 (7th Cir. 2003); *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Under the familiar indirect *McDonnell Douglas* burden-shifting analysis, Goodum must first establish a prima facie case of discrimination by proving that (1) she is a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) a similarly situated employee not in the protected class was treated more favorably. *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If Goodum succeeds in making out a prima facie case, the Army must articulate a legitimate, non-discriminatory explanation for the adverse employment action. If it does so, the Army "would then be entitled to summary judgment unless [Goodum] can rebut this explanation with evidence that it is pretextual." *Id.* at 978-79 (citing *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 886 (7th Cir. 2001)).

## A.    Direct Evidence

Goodum argues that Petron's derogatory comments about her "in conjunction with [her] announcement of her pregnancy and telecommuting status" constitute direct evidence of discrimination. (Pl. Mem., at 23.)[17] Goodum claims, for example, that Petron called her while she was telecommuting and made the following statements: "Oh, how nice - it must be nice that you

---

[17]    Plaintiff's F.R.C.P. 56 Memorandum of Law in Support of Motion for Summary Judgment is cited as "Pl. Mem., at ___."

get to stay home"; "Yeah, well, we have to stay here later, and you don't"; "Must be nice that as a woman . . . you get to take these kinds of privileges"; and the problem with Goodum's leave "is that you said you were going to come back right after [the baby] was born, and now you're just abusing my – you know, generosity." As a preliminary matter, it is not clear how Petron's statements relate to any adverse employment decision. *See Venturelli v. ARC Community Servs., Inc.*, 350 F.3d 592, 602 (7th Cir. 2003) ("For . . . a statement to be sufficient circumstantial evidence under the direct method, the remark in question must be 'directly related to the employment decision.'") It is undisputed that Marlett approved Goodum's request to work from home, and that she received her FMLA leave.

Goodum claims that Petron engaged in a "smear campaign" against her at work by referring to her pregnancy as a "show stopper," and by telling her co-workers that she was abusing the FMLA and was "not a team player." Again, Goodum has not explained how she suffered any adverse employment action as a result of these statements. Even assuming she did, Lynn Barden is the only person who testified that Petron said Goodum was "not a team player, wasn't supporting the unit, and was not doing her job." (Pl. Facts ¶ 71; Transcript of Factfinding Conference, at 177.) None of these statements relates in any way to Goodum's gender or pregnancy, nor do they create an inference of intentional discrimination. *See, e.g., Somerville v. City of Chicago*, 291 F. Supp. 2d 737, 744 (N.D. Ill. 2003) (statement that the plaintiff had "a hurdle to get over" because she was black did not indicate that the decision-maker "was inclined to discriminate against [her] because of her race."); *Koszola v. Board of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (internal quotations omitted) (circumstantial evidence of discrimination under the direct method "must point directly to a discriminatory reason for the employer's action.")

Aside from Barden's testimony, Goodum's only evidence of a "smear campaign" is her own testimony recounting hearsay statements from co-workers who purportedly told her that they heard Petron make negative statements about her. Such hearsay testimony is not sufficient to establish

direct evidence of discrimination. *Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 563 (7th Cir. 1998) ("[H]earsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial.") Petron did use the phrase "show-stopper" in his notes from a December 9, 1999 meeting, but it related to budget formulation and presentation, and not Goodum's pregnancy:

1.    You, baby, command
2.    Budget formulation & presentation = "Show Stopper"

(Pl. Facts ¶ 48; Ex. 11 to Pl. Facts.) On these facts, Goodum has not established direct evidence of discrimination.

### B.    Indirect Evidence

Goodum claims that she has nonetheless established an indirect case of sex and pregnancy discrimination. The Army disagrees, arguing that she did not suffer an adverse employment action and cannot identify any similarly situated male or non-pregnant employees who were treated more favorably. The Army also argues that Goodum cannot demonstrate that its stated reasons for its employment decisions are a pretext for unlawful sex discrimination.

Goodum has identified some 17 purported adverse employment actions, most of which merit little discussion. (Pl. Reply, at 6-7.)[18] Petron's opposition to Goodum's telecommuting and demand that she "prematurely invoke family medical leave" are not adverse employment actions because she was in fact allowed to telecommute from January 11 to August 20, 2000, and she received all the FMLA leave to which she was entitled. Goodum has not identified any adverse employment action resulting from Petron's allegedly bad-mouthing her to co-workers, nor is there any evidence to support her claim that she was barred from communicating with General Allen. Finally, the Army's "propos[al] to discharge Plaintiff on several occasions" – without actually doing

---

[18]    Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment is cited as "Pl. Reply, at __."

so – does not amount to an adverse action.[19] *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 n.1 (7th Cir. 2004) ("An adverse employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."); *Shannon v. Hotel Employees and Restaurant Employees Int'l Union*, No. 01 C 9711, 2005 WL 2387689, at *13 (N.D. Ill. Sept. 22, 2005) ("For purposes of Title VII, an adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities.")

The remaining adverse employment actions may be summarized as follows: (1) Goodum was required to keep an activity log while she telecommuted; (2) Goodum was given too much work to complete; (3) Goodum was not allowed to transfer in her civilian capacity to the personnel section; (4) Petron gave Goodum a bad reference when she applied for the RMO position at the 416th Engineer Command and she did not get the position; (5) Petron gave Goodum a counseling statement; (6) Goodum was required to perform physical training on the premises; and (7) Goodum's request for medical leave was denied. The court considers each in turn.

### 1. Activity Log

Marlett approved Goodum's request to work from home between January 20 and June 21, 2000 on the condition that she maintain communication with Petron and submit an activity log for every pay period. Goodum objects that the log took more time than it was worth to complete and added to her workload, neither of which rises to the level of an adverse employment action. *See Herron*, 388 F.3d at 300 n.1; *Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *18 (N.D. Ill. Aug. 4, 2003) ("A simple increase in workload is not enough to show an adverse employment action"). Even if it did, Goodum has not identified any other employee in her division who was

---

[19] Goodum makes much of the fact that the Army discharged her from the reserves on November 12, 2002. As noted, however, the court has dismissed all claims related to Goodum's military service.

allowed to work at home but was not required to keep an activity log. (Army Facts ¶¶ 25, 26; Goodum Dep., at 96.) See Peppers v. Climco Coils Co., No. 01 C 50163, 2002 WL 31163753, at *2 (N.D. Ill. Sept. 30, 2002) ("Peppers' prima facie case . . . fails because she has not shown similarly situated non-pregnant employees were treated more favorably than her.")

In addition, Marlett explained that he required Goodum to complete an activity log so that Petron could account for her hours and sign her paycard, and so that Marlett had some documentation to show headquarters that the division was "in control of what was happening." (Id. ¶ 22; Marlett Dep., Ex. H to Army Facts, at 9.) Goodum has no evidence that this legitimate, non-discriminatory explanation for the activity log is a pretext for discrimination. To the contrary, Goodum herself believes that an activity log is "a great idea" because "there's always going to be people to take advantage of the system." (Army Facts ¶ 23; Goodum Dep., Ex. E to Army Facts, at 91.) Goodum also admits that when she failed to complete her activity log on occasion, Petron never revoked her telecommuting privileges or otherwise disciplined her. Thus, the activity log is not evidence of discrimination.

### 2. Workload

Goodum next argues that Petron gave her too much work to complete. On February 23, 2001, she wrote a "Memorandum for the Record" entitled "Workload and Responsibilities," stating that Petron often asked her to perform tasks she believed were his responsibility, and that "[t]he bottom line for [her] was that [Petron's] continuous interruptions of [her] daily work [was] causing [her] work to go by the waist [sic] side." (Army Facts ¶ 60; Ex. O to Army Facts.) In early March 2001, Petron began complaining to Fee that Goodum was not doing her job in an effective manner. At the same time, Goodum was complaining to Fee that Petron was giving her too much work. (Id. ¶ 62.) Fee responded by working with Petron and Goodum to mediate their dispute. He also

reviewed Goodum's workload and determined that it was very similar to the workload performed by other budget analysts at other facilities.

After Silva replaced Fee as Comptroller of the 85th Division in September 2001, Goodum complained to him that she remained overworked. When Silva asked her whether she was required to perform tasks not normally required of someone in her position, however, Goodum was "vague" and stated only that "there were things she had to clean up . . . ." (*Id.* ¶ 87; Silva Dep., Ex. P to Army Facts, at 11.) Significantly, Goodum declined Petron's suggestion to have Bryan Edwards, the other budget analyst, assist her with the OMA fund. She also declined Petron's suggestion that she contact Sergeant Ordija for assistance because she thought it would take too much time to train him.

Goodum argues that in December 2001, Petron prepared employee objectives for her that were unattainable. It is undisputed, however, that Goodum failed to respond to Petron's email requesting her input on those objectives. In addition, Silva changed all employees' work schedules in the section and made everyone's days longer to account for an increased workload following the events of September 11, 2001. (*Id.* ¶¶ 81-83; Pl. Facts ¶ 27.) As noted, "[a] simple increase in workload is not enough to show an adverse employment action," particularly where it applies to all employees. *Buttron*, 2003 WL 21801222, at *18. As for Goodum's complaint that Petron assigned her tasks that were his responsibility, Edwards testified that Petron "dumped on" him in the same way. (Army Facts ¶ 61.) *See Yonehara v. American Airlines, Inc.*, No. 02 C 8561, 2004 WL 2222184, at *13 (N.D. Ill. Sept. 30, 2004) (an onerous workload may constitute an adverse employment action assuming it is "more onerous . . . than other employees" who are similarly situated). Thus, Goodum's workload complaints cannot support her claim of discrimination.

### 3. Transfer to Personnel Section

In November 2001, Goodum learned about an opening at her level in the personnel section of the 85th Division. Goodum talked to Audrey Strubbe, the top civilian employee in the personnel section, and the person who, according to Goodum, would make the hiring decision. Goodum claims that Strubbe was very excited about her interest and stated that she "would love for [Goodum] to come downstairs" and work in her section. Goodum also admits, however, that Strubbe told her that she would have to "rate out" for the position – i.e., "fill out a packet with all of [her] qualifications." (Goodum Dep., at 130.) As Strubbe explained, employees who want to "lateral into a position" must submit a packet in order to get qualified, and employees who fail to submit a packet "can't get lateraled into that position." (Army Facts ¶ 78.)

To establish a prima facie case of failure to transfer or hire, Goodum must show, among other things, that she applied for the position sought and that the position went to someone outside the protected class who was not better qualified. *Rabinovitz v. Pena*, 89 F.3d 482, 486 (7th Cir. 1996). "If an employer has a 'formal system of posting job openings and allowing employees to apply for them,' then the employee's failure to apply for an open position 'would prevent her from establishing a *prima facie* case.'" *Coleman v. City of Chicago*, No. 02 C 4141, 2003 WL 22057018, at *6 (N.D. Ill. Sept. 4, 2003) (quoting *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985)). Here, employees seeking a lateral transfer were required to "rate out" for the open position by submitting a packet with their qualifications. Goodum never submitted such a packet; Beverly Kozlowski, the person ultimately hired for the personnel position, did submit a packet. On these facts, the Army's decision not to transfer Goodum to the personnel department does not support her discrimination claim.

### 4.    Bad Reference

In October 2001, Goodum applied for a Resource Management Officer ("RMO") position at the 416th Engineer Command. That position is comparable to the one held by Petron at the 85th Division and would have been a promotion for Goodum. Colonel Gieb of the 416th Engineer Command interviewed Goodum for the job and also called Petron to inquire about her qualifications. Petron told Gieb that Goodum had excellent technical skills but needed more supervisory skills. On February 4, 2002, Goodum learned that the Army gave the RMO position to Debra McDonald.

To establish a claim for failure to promote, Goodum must prove, among other things, that she applied for and was qualified for the RMO position, and that Debra McDonald is neither in her protected class nor better qualified than her. *Grayson v. City of Chicago*, 317 F.3d 745, 748 (7th Cir. 2003). McDonald, a female, is not outside Goodum's protected class. *See Jordan v. City of Gary*, 396 F.3d 825, 833 (7th Cir. 2005) (no prima facie case of discrimination where promoted employee was "a member of the same protected class as [the plaintiff].") Nor is there any evidence that Goodum, who lacked the requisite supervisory skills, was equally qualified for the position. Goodum's belief that she did not need supervisory skills for the RMO position, and that she was in fact more qualified than McDonald, cannot defeat the Army's motion for summary judgment. Goodum admits that she does not know what criteria the hiring official at the 416th used to select the successful candidate. *See Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.")

In addition, Goodum has not offered any admissible evidence regarding McDonald's job qualifications as compared with her own. Even if she had, moreover, it is well-established that "the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the

35

candidate selected over the plaintiff for the job in question." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180-81 (7th Cir. 2002) (internal quotations omitted). Goodum has not made such a showing in this case and the court will not second-guess the Army's decision to hire McDonald. *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 693 (7th Cir. 2005) ("Above all, we are mindful that courts do not sit as super-personnel departments, second-guessing an employer's facially legitimate business decisions.") (internal quotations omitted); *Wernsing v. Department of Human Servs., State of Illinois*, 427 F.3d 466, 468 (7th Cir. 2005) (internal quotations omitted) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII . . . do[es] not interfere.") The Army's motion for summary judgment on Goodum's failure to promote claim is granted.

### 5. Counseling Statement

On December 28, 2001, Goodum left work early without permission to do her physical training. Petron attempted to issue Goodum a formal counseling statement on December 31, 2001, but Petron honored Goodum's request to wait until she had a witness present. On January 8, 2002, Petron issued Goodum's counseling statement in the presence of Audrey Strubbe. The counseling statement noted that civilian employees could only leave early if they had permission from a supervisor, and that Goodum did not have permission on the date in question because she had not yet completed a project. Goodum submitted a rebuttal to the counseling statement claiming that she could not have completed the project even if she had worked all weekend, and stating that "I had my coat on at this point, I told everyone to have a nice weekend, and [I] left for the day." (Ex. W to Army Facts.)

The Seventh Circuit has held that "[t]here must be some tangible job consequence accompanying [a] reprimand to rise to the level of a material adverse employment action; otherwise every reprimand or attempt to counsel an employee could form the basis of a federal suit." *Lucas*

*v. Chicago Transit Authority*, 367 F.3d 714, 731 (7th Cir. 2004). Goodum has not identified any such tangible job consequence in this case. To the contrary, Goodum admits that she was never disciplined or demoted, much less as a result of the counseling statement, and that she always received good performance evaluations. (Pl. Facts ¶¶ 14, 17, 18; Army Facts ¶ 136.) Goodum does claim that she was denied a lateral transfer to the personnel section because Strubbe witnessed her counseling statement. As explained earlier, however, it is clear that Goodum did not get the personnel position because she failed to submit the necessary documentation. *See Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 613 (7th Cir. 2001) (no adverse employment action where the plaintiff "has not pointed to any immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities.")

### 6. Physical Training

On January 7, 2002, Petron sent Goodum an email message inquiring why she had left work at 2:00 p.m. that day. Goodum responded the next day, stating that she had left for PT. Petron replied to Goodum's email message stating that Goodum had to conduct her PT on the premises, and attaching a "Memo for the Record" to that effect which he had prepared on December 31, 2001. (Exs. S and U to Army Facts.) In response, Goodum emailed Petron accusing him of discriminating against her with respect to her PT and attempting to "harass [her] because [she] want[ed] to leave the section." (Ex. S.) As a preliminary matter, requiring Goodum to perform PT on the premises is not an adverse employment action for purposes of Title VII; it is merely an inconvenience. *McKenzie v. Milwaukee County*, 381 F.3d 619, 625 (7th Cir. 2004) (quoting *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002)) ("To be actionable, an employment action must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'")

37

In any event, the change in PT policy is not evidence of discrimination because Silva issued a policy on January 9, 2002 stating that it applied equally to all employees in the section. (Ex. V to Army Facts.) Goodum believes that all employees except her were in fact exempt from the policy. Edwards testified, however, that he was no longer allowed to perform PT away from the facility after that date. Constance Storer did testify that she never had to perform her PT on the premises, but she also stated that she left the 85th Division in November 2000, long before Silva issued the policy. (Storer Dep., at 165.)

### 7. Medical Leave

Goodum finally argues that "Petron's denials of medical leave is an adverse employment decision." (Pl. Reply, at 6.) The court disagrees. Goodum began a medical leave of absence on January 29, 2002, and she remained on leave at least until the date of her deposition on March 16, 2004, more than two years later. Goodum has not provided any basis for her assertion that she was denied medical leave, much less that she was discriminated against for requesting the leave.

In sum, Goodum has not established claims for either sex or pregnancy discrimination and the Army's motion for summary judgment on these claims is granted.

### V. Harassment

Both parties next seek summary judgment on Goodum's claim that Petron subjected her to a hostile work environment because of her gender in violation of Title VII. To be actionable, harassment must occur "because of" the plaintiff's sex, and "must be sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive working environment." *Rizzo v. Sheahan*, 266 F.3d 705, 711-12 (7th Cir. 2001) (quoting *Cooke v. Stefani Mgmt. Servs., Inc.*, 250 F.3d 564, 566 (7th Cir. 2001)). Title VII "is not a 'general civility code' designed to purge the workplace of all boorish or even harassing conduct." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001). "Inappropriate conduct that is 'inflicted regardless of sex

38

[] is outside the statute's ambit,' . . . and an employer cannot be held liable for creating or condoning a hostile working environment unless the hostility is motivated by gender." *Id.* (quoting *Holman v. Indiana*, 211 F.3d 399, 403 (7th Cir. 2000)).

In this case, Petron was disrespectful and demeaning to all of his employees regardless of their gender. Bryan Edwards stated that Petron scrutinized everything he did and gave him a hard time. Cordell Rich similarly described Petron as coarse, direct, and insensitive to all of his employees. Colonel Lynn Barden testified that Petron is "a loose cannon and can't control his attitude or temper at times," and Fee himself finds Petron intense, not a "people person," abrasive, and demeaning. During a drill training weekend in July 2000, Fee received a "myriad of complaints" about Petron, including that he did not listen properly; was demeaning to his subordinates; reacted loudly and boisterously when he disagreed with someone; corrected his subordinates in public; and told his subordinates that they were stupid. Petron's behavior towards his employees was undoubtedly unpleasant, but it was not based on gender and, thus, does not constitute actionable harassment under Title VII.

Goodum claims that Petron harassed her by making derogatory remarks about her pregnancy and FMLA leave. As noted, however, Goodum offers nothing but hearsay statements and gender-neutral comments to support this assertion. Goodum also finds it "undisputable that Mr. Petron exhibited a malignant heart toward Plaintiff when she began telecommuting." (Pl. Mem., at 19.) "[P]ersonality conflicts between employees[, however,] are not the business of the federal courts." *Vore v. Indiana Bell Telephone Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994). In any event, Marlett approved Goodum's request to telecommute, notwithstanding Petron's objections. Finally, there is no support for Goodum's assertion that in August 2000, Petron "insisted on assigning [her] the task, at seven months pregnant, of gathering information from five different states and headquarters, formatting it into an established format and coordinating the division's $20 million budget." (Pl. Resp., at 7.) Goodum gave birth on June 22, 2000 and could not have been seven

months pregnant in August. Goodum concedes, moreover, that Fee withdrew that assignment. The Army is entitled to summary judgment on Goodum's harassment claim.

## VI.    Retaliation

Goodum's retaliation claim is somewhat vague, but it appears that she is arguing that Petron retaliated against her for getting pregnant and asking to telecommute. (Pl. Reply, at 4-5.) To establish a prima facie case of retaliation, Goodum must prove that (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the protected expression and the adverse action. *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005). Goodum has not cited a single case, nor is the court aware of any, holding that requesting telecommuting privileges constitutes "protected expression" under the Act. *See, e.g., Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002) (plaintiff "must show that she engaged in statutorily protected expression by complaining about discrimination covered by Title VII.") In any event, Goodum cannot establish that she suffered an adverse employment action as a result of that request. To the contrary, she was allowed to telecommute for five months and was never disciplined or demoted, even when she failed to complete her activity log.

Though neither party mentions it, Goodum's EEO complaint certainly constitutes protected expression for purposes of Title VII. *See Lowell v. Brown*, No. 96 C 562, 2000 WL 521726, at *6 (N.D. Ill. Mar. 2, 2000) ("EEO complaint constitutes protected expression within the meaning of Title VII.") As with the discrimination claims, however, Goodum has not identified any adverse actions resulting from that complaint. Petron attempted to issue Goodum's counseling statement on December 31, 2001, two days before she contacted the EEO Office on January 2, 2002. Moreover, it related not to Goodum's EEO complaint, but to the fact that she left work early on December 28, 2001 without permission. In addition, the decision to revoke off-premises PT

40

privileges applied to all employees regardless of whether they filed an EEO complaint. Finally, Goodum was granted a medical leave of absence extending at least two years, which in no way evidences retaliatory intent. Goodum has not established that she suffered any actionable adverse actions, much less that there is any causal connection between those actions and her EEO complaint. Significantly, Goodum's own Memorandum for Record of January 11, 2002 indicated that Petron was harassing her in retribution for her attempts to leave the section, and not because she had filed an EEO complaint. The Army's motion for summary judgment on this claim is therefore granted.

## CONCLUSION

For the reasons stated above, the Army's motions to deem facts admitted (Doc. No. 45) and for summary judgment (Doc. No. 37) are both granted, and Goodum's motion for summary judgment (Doc. No. 32) is denied. The clerk is directed to enter judgment in favor of Defendant.

ENTER:

*Nan R. Nolan*

Dated: March 3, 2006

NAN R. NOLAN
United States Magistrate Judge

41